UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GERACER R. TAYLOR,

        Petitioner,

                                  CASE NO. 2:09-CV-14214

   v.                             JUDGE STEPHEN J. MURPHY, III

                                  MAGISTRATE JUDGE PAUL J. KOMIVES

JOHN PRELESNIK,

        Respondent.[1]

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     D.    *Confrontation (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     E.    *Sufficiency of the Evidence (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
     F.    *Prosecutorial Misconduct (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
     G.    *Fair Cross-Section (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
     H.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . . 37
          1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     I.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

_____

[1]By Order entered this date, John Prelesnik has been substituted in place of Mary Berghuis as the proper respondent in this action.

I.      <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should nevertheless grant petitioner a certificate of appealability with respect to petitioner's confrontation claim, but should deny a certificate with respect to petitioner's remaining claims.

II.     <u>REPORT</u>:

A.      *Procedural History*

1.      Petitioner Geracer R. Taylor is a state prisoner, currently confined at the Ionia Maximum Correctional Facility in Ionia, Michigan.

2.      On August 5, 2005, petitioner was convicted of first degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a); and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Macomb County Circuit Court.  On September 20, 2005, he was sentenced to a mandatory term of life imprisonment without possibility of parole on the murder conviction, and to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      BOTH MICHIGAN LAW AND THE MICHIGAN AND UNITED STATES CONSTITUTION REQUIRE SUFFICIENT EVIDENCE TO CONVICT A DEFENDANT OF A CRIMINAL OFFENSE.  THERE WAS INSUFFICIENT EVIDENCE IN THIS CASE TO SUSTAIN THE VERDICTS OF FIRST DEGREE MURDER AND FELONY FIREARM.

II.     THE VERDICTS OF FIRST DEGREE MURDER AND FELONY FIREARM WERE AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

III.    THE TRIAL COURT REVERSIBLY ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS HEARSAY STATEMENTS

2

FROM DECEDENT THAT DEFENDANT HAD SHOT HIM.

IV.     THE TRIAL COURT DENIED DEFENDANT DUE PROCESS AND
        EQUAL PROTECTION BECAUSE HE WAS NOT TRIED BY A JURY OF
        HIS PEERS.

V.      POLICE   AND   PROSECUTORIAL   MISCONDUCT   DEPRIVED
        DEFENDANT   OF   A   FAIR   TRIAL   CONSTITUTING   MANIFEST
        INJUSTICE.

VI.     DEFENDANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF
        COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Taylor*, 275 Mich. App. 177, 737 N.W.2d 790 (2007).

        4.      Petitioner sought leave to appeal these issues to the Michigan Supreme Court.  In his

application for leave to appeal, petitioner reformulated his hearsay evidence claim as follows:

        THE TRIAL COURT AND COURT OF APPEALS REVERSIBLY ERRED IN
        DENYING DEFENDANT'S MOTION TO SUPPRESS HEARSAY STATEMENTS
        FROM DECEDENT THAT DEFENDANT HAD SHOT HIM.   THOSE
        STATEMENTS VIOLATED DEFENDANT'S RIGHT TO CONFRONTATION
        UNDER THE SIXTH AMENDMENT AND *CRAWFORD V WASHINGTON*, AND
        WERE NOT ADMISSIBLE UNDER ANY LAWFUL EXCEPTIONS TO THE
        RULE.

        A.      THE TRIAL COURT AND COURT OF APPEALS ERRED IN
                CONCLUDING THAT THE STATEMENTS WERE NON-
                TESTIMONIAL.

        B.      THE TRIAL COURT AND COURT OF APPEALS ERRED IN
                HOLDING THAT THERE IS AN ESTABLISHED DYING
                DECLARATION EXCEPTION TO *CRAWFORD V. WASHINGTON*.

        C.      THE TRIAL COURT AND COURT OF APPEALS ERRED IN
                HOLDING THAT THE DECEDENT'S STATEMENTS IN THIS
                CASE WOULD FALL WITHIN THE DYING DECLARATION
                EXCEPTION AS IT STOOD WHEN THE SIXTH AMENDMENT
                WAS RATIFIED.

The Supreme Court initially granted petitioner's application for leave to appeal.  *See People v.*

*Taylor*, 480 Mich. 946, 741 N.W.2d 24 (2007).  After hearing oral argument, however, the Court vacated its grant of leave to appeal and denied petitioner's application.  *See People v. Taylor*, 481 Mich. 943, 752 N.W.2d 454 (2008).

5.      Petitioner subsequently filed a petition for writ of *certiorari* in the United States Supreme Court, raising his confrontation claim.  On November 3, 2008, the Supreme Court denied *certiorari*.  *See Taylor v. Michigan*, 129 S. Ct. 512 (2008).

6.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on October 27, 2009.  As grounds for the writ of habeas corpus, he raises the confrontation claim he raised in the state courts.

7.      Respondent filed his answer on May 6, 2010.  He contends that petitioner's confrontation claim is without merit.

8.      Petitioner filed an amended application on May 26, 2010.  In his amended application, petitioner adds the sufficiency of the evidence, prosecutorial misconduct, and fair cross-section claims that he raised in the state courts.[2]  Petitioner also filed a reply to respondent's answer on June 14, 2010.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from the shooting death of Buel Lasater.  The evidence adduced at trial was accurately summarized in the prosecutor's brief in the Michigan Supreme Court, as reproduced in respondent's answer:

In September of 2004, 26-year-old Buel Lasater ("Buel") lived off and on

---

[2]Although respondent has not had the opportunity to answer petitioner's newly added claims, for the reasons explained below the Court can resolve these claims without requiring a further answer from respondent.  Further, petitioner has not filed a brief addressing these claims, so I rely on the briefs filed by petitioner in the state courts.

with his long-time friend, Jason Jackson ("Jason"), at Jason's house at 13983 Knox
in Warren. (Tr. 7-28-05, 8-10; Tr. 7-29-05, 67). Jason worked at a moving company
called Always Moving. (Tr. 7-28-05, 8). Buel also worked at Always Moving,
although in a part-time capacity. (Tr. 7-28-05, 8).

On September 30, 2004, Buel and Jason worked from 10:00 a.m. to 5:00 p.m.
(Tr. 7-28-05, 10-11). A third co-worker, Jim Love ("Jim"), worked with Buel and
Jason that day. (Tr. 7-28-05, 10-11; Tr. 7-29-05, 38-39). After 5:00 p.m., Buel,
Jason, and Jim bought beer and went back to Jason's house. (Tr. 7-28-05, 11-12; Tr.
7-29-05, 40-41). Soon, other individuals, including Ray Peters ("Ray") and Terrah
Salamone ("Terrah"), stopped by the house and it "became a little party." (Tr.
7-28-05, 12, 14-15, 87-91; Tr. 7-29-05, 9-10, 42-43). Terrah was Buel's girlfriend.
(Tr. 7-29-05, 7). One of the individuals who came by the party was Geracer Taylor
("Taylor"), known as "Booger." (Tr. 7-28-05, 12-13, 86-87; Tr. 7-29-05, 7-8, 11-12,
43-44; Tr. 8-2-05, 14).

Buel and Taylor "didn't really care for each other." (Tr. 7-28-05, 16-17). At
one point during the evening, Buel and Taylor exchanged words and got into a fight.
(Tr. 7-28-05, 17; Tr. 7-29-05, 12-13, 45-46). Buel struck Taylor three or four times
in the jaw and knocked him to the ground. (Tr. 7-28-05, 17-18; Tr. 7-29-05, 46).
Jason "got in between them and broke it up," telling Buel that he did want any
fighting in his house. (Tr. 7-28-05, 17-18; Tr. 7-29-05, 13-14, 46). Ray assisted Jason
in breaking up the fight. (Tr. 7-28-05, 18; Tr. 7-29-05, 13-14). After the altercation,
Buel and Taylor went back into Jason's sunroom and "to talk it out." (Tr. 7-28-05,
18-19). Later that evening, Buel and Taylor shook hands. (Tr. 7-28-05, 19, 93-94;
Tr. 7-29-05, 14, 46-47). It did not appear to the partygoers, however, that the
reconciliation was sincere. (Tr. 7-28-05, 44-45; Tr. 7-29-05, 26).

Later that evening, Buel and Terrah went into Jason's bedroom together and
had sex. (Tr. 7-28-05, 20-22; Tr. 7-29-05, 14). At one point while they were inside
the dark bedroom, Taylor "opened the door, and . . . stood there in the doorway"
under the hall light. (Tr. 7-29-05, 14-16). Buel said: "[W]ho is that?" (Tr. 7-29-05,
15). Terrah responded: "[I]t's Boog." (Tr. 7-29-05, 15). Eventually, he closed the
door. (Tr. 7-29-05, 15). Soon thereafter, Terrah went home. (Tr. 7-29-05, 16-18).
When she left, Taylor already had left the house. (Tr. 7-29-05, 17, 47).

Near 2:30 a.m., Taylor appeared at 22086 Eastwood in Warren, a house
inhabited by Christina Milne ("Christina"), along with her husband and their
children. (Tr. 8-2-05, 13-16, 19-20). Christina was acquainted with Taylor. (Tr.
8-2-05, 13-14). Taylor asked Christina if he could use her telephone "to get a ride
home." (Tr. 8-2-05, 15). Taylor left a voice message with someone asking for a ride
home. (Tr. 8-2-05, 15). Taylor informed Christina that he needed to wait for a return
call. (Tr. 8-2-05, 15). At this point, however, Christina was "getting ready to go to
bed" and told Taylor that he would have to leave. (Tr. 8-2-05, 15). Taylor left
Christina's house. (Tr. 8-2-05, 15). Christina's house was about ½ mile from Jason's
house on Knox. (Tr. 8-4-05, 11).

Most of the partygoers left Jason's house by the early morning. (Tr. 7-28-05,
20; Tr. 7-29-05, 48). Ultimately, only Ray, Buel, and Jason remained. (Tr. 7-28-05,

20). Jason went to bed on a couch. (Tr. 7-28-05, 21; Tr. 7-29-05, 16). Ray slept on a loveseat. (Tr. 7-28-05, 21, 94; Tr. 7-29-05, 16-17). Buel slept in Jason's bed. (Tr. 7-28-05, 21-22).

Just as he lay down on the couch, Jason heard a car door shut outside the house. (Tr. 7-28-05, 22). Looking through the blinds on the window, Jason observed Taylor "walking up to [his] porch." (Tr. 7-28-05, 22). At the front door, Jason said: "[W]e';re going to sleep, we've got to work in the morning." (Tr. 7-28-05, 22). Taylor insisted he had to wake up Ray. (Tr. 7-28-05, 22). Jason "tried pretty hard to wake [Ray] up." (Tr. 7-28-05, 22). Jason "lifted him up and smacked him in the face." (Tr. 7-28-05, 22). Ray had been drinking all night, however, and these efforts were unsuccessful. (Tr. 7-28-05, 22-23). Taylor got a glass of water and "poured it on Ray's face." (Tr. 7-28-05, 23). Ray woke up and told Taylor: "Do that again I'll beat your fucking ass." (Tr. 7-28-05, 23). Ray went back to sleep. (Tr. 7-28-05, 23).

Taylor stood over Ray for a few moments and then sat down in a chair in the kitchen. (Tr. 7-28-05, 23). Taylor "just sat there with his hands folded . . . for a good couple of minutes." (Tr. 7-28-05, 23). As he sat there, Buel walked out of the bathroom and back into Jason's bedroom. (Tr. 7-28-05, 24). From the couch where he was lying, Jason told Buel: "[W]e got [to] get up for work in the morning, you better wake up." (Tr. 7-28-05, 25). Buel laughed and said that he would wake up. (Tr. 7-28-05, 25). Jason told Taylor that they had "to wake up in the morning, we got to go to sleep." (Tr. 7-28-05, 25). Taylor left the house. (Tr. 7-28-05, 25). Jason locked the door after Taylor and went back to sleep. (Tr. 7-28-05, 25).

Karen Vineyard ("Karen") and her husband live at 13995 Knox, lived directly to the east of Jason on Knox. (Tr. 7-28-05, 60-62; Tr. 8-2-05, 55-57). Karen heard "loud noises and traffic in and out next door" all through the evening. (Tr. 8-2-05, 57; Tr. 8-4-05, 8). On several occasions, Karen asked the partygoers "to please be quiet." (Tr. 8-2-05, 57). Ultimately, the party broke up. (Tr. 8-2-05, 57). Between 5:00 and 6:00 p.m., however, Karen heard pounding on Jason's front door. (Tr. 8-2-05, 58; Tr. 8-4-05, 8). She heard a voice that she recognized as one of the voices she had heard at the party earlier that morning. (Tr. 8-4-05, 8-9). Several minutes later, she "heard gunshots ring out." (Tr. 8-2-05, 58, 71). She ran to her window and saw "someone come running and going west on Knox toward Schoenherr." (Tr. 8-2-05, 58). Karen viewed "someone else come off [Jason's] porch and run west . . . towards Schoenherr as well." (Tr. 8-2-05, 58-60). Both men were African-American. (Tr. 8-2-05, 59). Karen called 9-1-1. (Tr. 8-2-05, 60-61). Taylor was the only African-American at the party. (Tr. 7-28-05, 109).

At about 5:45 a.m., Michael Flores ("Michael") was asleep inside his house at 13958 Knox. (Tr. 8-2-05, 21-24). His house is located "kitty-corner across the street" from Jason's house. (Tr. 8-2-05, 22). Michael awoke to barking from his neighbor's dogs. (Tr. 8-2-05, 22-23). Next, Michael heard "a series of popping sounds in front of [his] house." (Tr. 8-2-05, 22-23). After putting on a pair of pants, Michael came to his front door and observed "a car t[aking] off with no lights on across the street." (Tr. 8-2-05, 22-23). Moments later, Michael heard screams for help. (Tr. 8-2-05, 22-23).

6

Officer David Kriss ("Officer Kriss") of the Warren Police Department ("WPD"), on routine patrol with Officer Swatowski, was dispatched to a "shots heard" call on Knox. (Tr. 7-28-05, 49-50). Officer Kriss, overhead lights and siren activated, drove to Jason's house on Knox. (Tr. 7-28-05, 51-52). When he arrived Officer Kriss observed "several people . . . standing on the front lawn[s] on either side of [13983 Knox]." (Tr. 7-28-05, 52). These neighbors "were excited." (Tr. 7-28-05, 52). They told Officers Kriss and Swatowski "that they had heard shots fired." (Tr. 7-28-05, 52). Further, the neighbors informed the WPD officers that "[t]hey heard someone calling . . . for help from the house." (Tr. 7-28-05, 52). Officer Kriss also heard a voice from inside Jason's house calling for help. (Tr. 7-28-05, 52).

Officers Kriss and Swatowski "knocked and announced [them]selves and when [they] weren't given entry, [they] kicked the door in." (Tr. 7-28-05, 52). As they did, a third WPD officer, Officer Petrozini, joined them. (Tr. 7-28-05, 53). Coming through the front door into the living room, the WPD officers observed Jason sleeping on the couch and Ray sleeping on the loveseat. (Tr. 7-28-05, 53). The WPD police officers, after much difficulty, woke up Jason and Ray. (Tr. 7-28-05, 25, 53, 95-96). Jason observed WPD police officers all over his house when he awoke. (Tr. 7-28-05, 25). Looking into his bedroom, Jason saw "a lot of blood" and Buel "hunched over holding himself, . . . moaning real loud." (Tr. 7-28-05, 25-26). Officers Swatowski and Petrozini secured the living room. (Tr. 7-28-05, 53).

Officer Kriss entered Jason's bedroom, located in the front of the house in the southeast corner. (Tr. 7-28-05, 53). Officer Kriss observed Buel standing inside the room "in front of a window, the bottom half of which was full of a air conditioner." (Tr. 7-28-05, 54, 58). The vinyl blinds in the window above the air conditioner "looked sort of tattered" and the window was open. (Tr. 7-28-05, 58-59). He "appeared to have been shot." (Tr. 7-28-05, 54). Buel had sustained wounds to "his hand, his abdomen, and his thigh." (Tr. 7-28-05, 54). Buel was "hunched over" and "clutching his abdomen." (Tr. 7-28-05, 54). Officer Kriss saw "copious amounts of blood" in the bedroom. (Tr. 7-28-05, 54). To Officer Kriss, "it looked like [Buel] had been in bed when he was shot" because "[t]here were bits of fluff from the blankets and pillow still floating in the air." (Tr. 7-28-05, 55). The bedroom smelled of gunpowder. (Tr. 7-28-05, 55). On a dresser next to the bed and under the window, Officer Kriss saw "small bits of flesh and blood." (Tr. 7-28-05, 55).

Officer Kriss "didn't think [Buel] would make it" and "tried to conduct an interview." (Tr. 7-28-05, 55). Officer Kriss had Buel lie down on the floor of the bedroom and advised him that emergency medical help was on the way. (Tr. 7-28-05, 55-56). When Officer Kriss asked Buel for a description of his assailant, however, Buel "seemed sort of reluctant." (Tr. 7-28-05, 56). Subsequently, Buel told Officer Kriss that he "had beefs" and stated: "[T]hat nigger, Booger, shot me." (Tr. 7-28-05, 56). Officer Kriss pressed Buel to tell him "Booger's" legal name. (Tr. 7-28-05, 56). Again, Buel "seemed reluctant to give [Officer Kriss] any information." (Tr. 7-28-05, 56). Officer Kriss told Buel that he was "in bad shape" and that he wasn't "going to make it." (Tr. 7-28-05, 56). Officer Kriss said: "You need to tell me who shot you.

7

You need to tell me who Booger is." (Tr. 7-28-05, 56). Buel repeated: "[T]hat nigger, Booger, shot me." (Tr. 7-28-05, 56). Officer Kriss was unsuccessful in gathering any additional information about the shooting from Buel. (Tr. 7-28-05, 56-57). Soon, emergency medical personnel arrived at the scene to treat Buel. (Tr. 7-28-05, 56-58).

Like Officers Kriss and Swatowski, WPD Officer David Bonacorsi ("Officer Bonacorsi") was on routine patrol when he heard the radio run for "a shooting" at 13983 Knox. (Tr. 7-28-05, 72-73). Officer Bonacorsi entered the house to assist the WPD officers already on the scene. (Tr. 7-28-05, 73). He viewed Buel "on the floor" in the bedroom and saw "blood all over." (Tr. 7-28-05, 74). When emergency medical personnel arrived, Officer Bonacorsi cleared a path into the house. (Tr. 7-28-05, 74-75). With help from Officer Bonacorsi, the emergency medical personnel removed Buel from the house on a gurney. (Tr. 7-28-05, 75-76).

Officer Bonacorsi observed that Buel had sustained "several gunshot wounds to his body." (Tr. 7-28-05, 77). He told Buel that "his gunshot wounds didn't look good" and that "the fire department didn't think he was going to make it." (Tr. 7-28-05, 77). Officer Bonacorsi asked Buel "if he knew who shot him." (Tr. 7-28-05, 77). Buel responded: "Booger shot me." (Tr. 7-28-05, 77). Buel stated that he and Taylor "had argued earlier in the evening." (Tr. 7-28-05, 77-78). Officer Bonacorsi accompanied Buel to the Bi-County Hospital. (Tr. 7-28-05, 78; Tr. 7-29-05, 68).

Officer Kriss left the bedroom and, along with some other WPD officers, walked around the outside of the house to the aforementioned window to Jason's bedroom. (Tr. 7-28-05, 58). From what he saw inside the bedroom, "it appeared [to Officer Kriss] that [Buel] had been shot through the window." (Tr. 7-28-05, 58). Immediately, the WPD officers "found a . . . white, plastic lawn chair under the window and some shotgun shells . . . on the ground under the window." (Tr. 7-28-05, 59).

WPD Officer David Helhowski ("Officer Helhowski") later processed the house for evidence. (Tr. 7-28-05, 59-60; Tr. 7-29-05, 75). Officer Helhowski seized "five spent shotgun casings" and the white plastic chair. (Tr. 7-29-05, 79-85). Three of the spent shogun casings were "Federal No. 6" and two of the spent shotgun casings were "Federal No. 8." (Tr. 8-2-05, 101). The chair had "two partial shoe prints" on it. (Tr. 7-29-05, 84). Inside the house, Officer Helhowski observed blood and flesh in "[s]everal different areas" of Jason's bedroom. (Tr. 7-29-05, 96-97). In addition, he observed "a hole in the [south] wall with blood spattered around it." (Tr. 7-29-05, 97). Officer Helhowski collected 26 pellets from the bed. (Tr. 7-29-05, 97-99).

Jason owned a white plastic chair that he kept in his backyard. (Tr. 7-28-05, 26-27). When he locked himself out of his house, Jason used the chair to climb into his house. (Tr. 7-28-05, 26-27). On the night of September 30, 2004, the chair had been in Jason's backyard. (Tr. 7-28-05, 27). The window to Jason's bedroom on the east side of the house had an air conditioning unit in it. (Tr. 7-28-05, 42). The window itself, however, could be lifted up "a good foot." (Tr. 7-28-05, 42). In processing the scene, Officer Helhowski measured this opening as "13 inches high by 24 inch width on the window." (Tr. 7-29-05, 111, 127). WPD Officer Chester

8

Holub ("Officer Holub"), also an evidence technician, assisted Officer Helhowski in processing the scene at Jason's house on Knox. (Tr. 7-29-05, 128-131).

WPD Detective James Ralston ("Detective Ralston") arrived at Jason's house just before 7:00 a.m. (Tr. 8-2-05, 79-81). After speaking to the WPD officers at the scene, Detective Ralston directed them to transport Jason and Ray to the police station for interviews. (Tr. 8-2-05, 82). During his conversation with the WPD officers, Detective Ralston also learned that Taylor was a suspect in Buel's shooting. (Tr. 8-2-05, 82). Detective Ralston and the WPD officers ascertained that Taylor resided at 17027 Veronica in Eastpointe, about 1.7 miles from Ms. Milne's house. (Tr. 7-29-05, 132-133; 8-2-05, 82-83; Tr. 8-4-05, 11). WPD police officers subsequently took Jason and Ray to the police station. (Tr. 7-28-05, 26, 62-63, 96). On the way, however, Ray showed the WPD officers Taylor's Eastpointe address. (Tr. 7-28-05, 63). Detective Ralston organized surveillance of 17027 Veronica and directed WPD Detective Keith Vanderkerkhove ("Detective Vanderkerkhove") to obtain a search warrant for the residence. (Tr. 8-2-05, 83-84; Tr. 8-3-05, 98).

Officer Holub assisted officers from the WPD and the Eastpointe Police Department in executing the search warrant upon 17027 Veronica, the house in which Taylor lived. (Tr. 7-29-05, 132-133; Tr. 8-2-05, 86). During the search, Officer Holub "located a box of shells in the front room." (Tr. 7-29-05, 134; Tr. 8-2-05, 4-5). The box contained "ten live rounds." (Tr. 7-29-05, 140). He also found "one loose shell . . . on the couch" and another "live round in the rear bedroom in a closet area." (Tr. 7-29-05, 134-138; Tr. 8-2-05, 89). The ammunition was "Federal No. 6" shells. (Tr. 7-29-05, 138). Subsequently, Officer Holub dusted the box for fingerprints and was able to lift two latent prints. (Tr. 8-2-05, 5).

Prior to the execution of the search warrant, Detective Ralston spoke to Taylor's mother, Michelle Taylor ("Michelle"), who arrived at the Eastpointe address as the police officers conducted surveillance and awaited the search warrant. (Tr. 8-2-05, 85-86; Tr. 8-3-05, 98). Detective Ralston and Michelle discussed weapons that may be inside the house. (Tr. 8-2-05, 87). Detective Ralston informed Michelle that the police officers were looking for a shotgun. (Tr. 8-2-05, 88). After conferring with Michelle, the police officers searched her bedroom closet. (Tr. 8-2-05, 88; Tr. 8-3-05, 101). The bedroom closet did not contain a weapon. (Tr. 8-2-05, 88; Tr. 8-3-05, 101). Again, Detective Ralston spoke with Michelle about the possible location of a shotgun. (Tr. 8-2-05, 88-89). Subsequently, the police officers "[l]ift[ed] the frame, box spring and mattress up off the floor." (Tr. 8-2-05, 89; Tr. 8-3-05, 101). The police officers did not recover a shotgun from this location. (Tr. 8-2-05, 89; Tr. 8-3-05, 101).

In response to Detective Ralston's inquiries regarding ammunition inside the house, Michelle had him "check[] a pile of clothing that was located in the bedroom near the nightstand." (Tr. 8-2-05, 90). As indicated above, Officer Holub already had found and seized a box of shotgun shells from a couch in the living room, as well as a loose shell. (Tr. 8-2-05, 90-91). Michelle told Detective Ralston that she "had no idea" how the box of shotgun shells came to be on the couch in the living room. (Tr. 8-2-05, 92). Subsequent to the search of Taylor's home, Detective Ralston obtained

an arrest warrant for him. (Tr. 8-2-05, 92).

 WPD officers arrested Taylor later that day. (Tr. 8-2-05, 100). WPD Officer David Vandelinder ("Officer Vandelinder") fingerprinted Taylor at the police station. (Tr. 8-2-05, 73-78). That same day, WPD Officer Douglas Ferich ("Officer Ferich"), a forensic technologist, determined that the latent prints lifted from the box of shotgun shells were made by Taylor. (Tr. 8-3-05, 40-42).

 Later that month, Lieutenant David Vroman ("Lieutenant Vroman") of the Michigan State Police ("MSP") examined the firearms-related evidence seized by the WPD during its investigation. (Tr. 8-3-05, 70-72). Lieutenant Vroman determined that the same weapon fired all five spent shot shells. (Tr. 8-3-05, 74). Three of the spent shot shells were 12-gauge "Number 6 shot, . . . manufactured and marketed by Federal Cartridge Company." (Tr. 8-3-05, 75). Two of the spent shot shells were "Number 8 shot, manufactured and marketed by Federal Cartridge Company." (Tr. 8-3-05, 75).

 In comparing these spent shot shells and the "Number 6" shells seized by the WPD from 17027 Veronica in Eastpointe, Lieutenant Vroman concluded that two of the spent 12-gauge "Number 6" shot shells, the two loose 12-gauge shot shells, and seven of the 12-gauge shot shells from the box of shells were "produced by a common source, a single bunter." (Tr. 8-3-05, 77). Further, Lieutenant Vroman found that the third spent 12-gauge "Number 6" shot shell and another of the 12-gauge shot shells from the box of shells were "produced by the same bunter." (Tr. 8-3-05, 77). Bunters have a limited lifetime of usefulness in the production process. (Tr. 8-3-05, 67, 79). Lieutenant Vroman also contacted the Federal Cartridge Company and learned that the box of shells found at 17027 Veronica was manufactured in February of 1972. (Tr. 8-3-05, 82-83).

 Buel died at Bi-County Hospital on October 17, 2004, at approximately 3:30 p.m. (Tr. 7-29-05, 68). Dr. Daniel Spitz ("Dr. Spitz") performed an autopsy on Buel the following day. (Tr. 8-4-05, 22). Dr. Spitz determined that Buel had sustained "four separate shotgun wounds, one of them involved the chest, one of them involved the abdomen, one of them involved the left thigh, and one of them involved the left hand." (Tr. 8-4-05, 23). He concluded that Buel had been shot from a range of three to four feet. (Tr. 8-4-05, 36, 40). Dr. Spitz found that the cause of Buel's death was "multiple shotgun wounds." (Tr. 8-4-05, 44-45). Further, he determined that the manner of Buel's death was a homicide. (Tr. 8-4-05, 45).

Answer, at 1-8 (quoting Pl.-Appellee's Answer, in *People v. Taylor*, No. 134206 (Mich.), at 1-14).

C.   *Standard of Review*

 Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

10

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539

11

U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Confrontation (Claim I)*

Petitioner first contends that the introduction of the victim's dying declaration violated his

12

right to confront the witnesses against him.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

    1.    *Clearly Established Law*

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process Clause.  *See Pointer v. Texas*, 480 U.S. 400, 406 (1965).  At the time of petitioner's trial, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980).  In *Roberts*, the Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude unreliable, out-of-court statements in criminal proceedings.  Thus, the Court reasoned:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability."  Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66.  As the Court explained in *Roberts*, reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception.  The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [their] reliability."  *Idaho v. Wright*, 497 U.S. 805, 821 (1990).  Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [the exception] comports with

the substance of constitutional protection." *Roberts*, 448 U.S. at 66 (internal quotation omitted).

In *Crawford v. Washington*, 541 U.S. 36 (2004), decided shortly after petitioner's trial, the Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements. After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause. *See id*. at 60-68. The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 68-69. In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68. The Court did, however, provide some guidance. Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*. at 51-52 (internal quotations and citations omitted). While the Court declined to adopt any of

these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68.

*Crawford* establishes a confrontation rule with respect to "testimonial" statements; it has no application to non-testimonial hearsay. The question therefore remains whether *Roberts* has any applicability to this case to the extent that the statements admitted at petitioner's trial were not testimonial hearsay under *Crawford*. Because it is now clear that the Confrontation Clause is not at all concerned with non-testimonial hearsay, the Court should conclude that *Roberts* has no application here. In *Crawford*, the Court suggested, but did not definitively rule, that the Confrontation Clause is limited to regulating the introduction of testimonial hearsay, and has no application at all to the admission at trial of non-testimonial hearsay. The Court explained that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68. Immediately following *Crawford*, the Courts concluded that *Roberts* remained applicable to non-testimonial hearsay, observing:

> [t]he lynchpin of the *Crawford* decision thus is its distinction between testimonial and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only to the former category of statements. . . . [U]nless a particular hearsay statement qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still controls.

*United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005); *see also*, *Horton v. Allen*, 370 F.3d 75, 83-84 (1st Cir. 2004); *United States v. Johnson*, 354 F. Supp. 2d 939, 964 (N.D. Iowa 2005); *United States v. Savoca*, 335 F. Supp. 2d 385, 391-92 (S.D.N.Y. 2004). Regardless of whether this reading of the *Crawford* dictum was correct, the Supreme Court has since clarified that the

Confrontation Clause is simply not implicated by the introduction of non-testimonial hearsay.  In *Davis v. Washington*, 547 U.S. 813 (2006), the Court explicitly addressed this question of "whether the Confrontation Clause applies only to testimonial hearsay," *id*. at 823, and in doing so abrogated *Roberts* in whole.  The Court noted that the answer to this question was suggested in *Crawford*, when the *Crawford* decision explained that the Confrontation Clause focuses on "witnesses" who give "testimony."  *Id*. at 823-24 (discussing *Crawford*, 541 U.S. at 51).  The *Davis* Court explained that "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter."  *Id*. at 824  Thus, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all, and need not be considered.  *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability.  Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Pugh*, 273 Fed. Appx. 449, 454 (6th Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

    2.    *Analysis*

Prior to trial the trial court held an evidentiary hearing regarding the admissibility of the victim's statements to the police.  At the conclusion of the hearing, the court found that the evidence was admissible on two bases.  First, "[t]he trial court reasoned that because the police officers took the statements from Lasater in the hectic minutes immediately following what turned out to be the fatal shooting of Lasater, the statements were not *testimonial* under *Crawford*[.]" *Taylor*, 275 Mich. App. at 181, 737 N.W.2d at 794.  Second, the trial court ruled that even if the statements were

16

testimonial, they were admissible as dying declarations.  *See id.*  The Michigan Court of Appeals rejected petitioner's confrontation claim on both these bases.  Relying on *Davis*, the court first concluded that the statements of the victim were not testimonial because the objective circumstances indicated that the primary purpose of the police was to respond to an ongoing emergency.  The court reasoned that "[w]hen, as here, police officers arrive at the scene immediately after a shooting, with a number of people in the house, and where the victim–who is clearly dying of multiple gunshot wounds–identifies his assailant, the identifying statements given to the police are nontestimonial under *Crawford*."  *Taylor*, 275 Mich. App. at 182, 737 N.W.2d at 794.

Although it is a close question, the Supreme Court's recent decision in *Michigan v. Bryant*, 131 S. Ct. 1143 (2011), suggests that the court of appeals's conclusion that the statements were not testimonial was, at a minimum, a reasonable application of *Crawford*.  In *Bryant*, police responded to a call indicating that a man had been shot.  When they arrived, the victim was lying on the ground in a gas station parking lot.  The police asked him what had happened, who had shot him, and where the shooting had occurred.  The victim identified his assailant.  His conversation with the police lasted about 5-10 minutes, until emergency medical services arrived.  *See id.* at 1150.  At trial, the court admitted the testimony of the officers regarding the victim's statements.  The Michigan Supreme Court reversed, concluding that the victim's statements were testimonial and therefore inadmissible under *Crawford*. *See id.* at 1150-51.  The Supreme Court reversed, concluding that the statements were not testimonial.  The Court noted that *Davis* made clear that "not all those questioned by the police are witnesses and not all interrogations by law enforcement officers are subject to the Confrontation Clause."  *Id.* at 1153 (internal quotation omitted).  The Court further noted, relying on *Davis*, that statements to police are not testimonial where "'the primary purpose

of the interrogation is to enable police assistance to meet an ongoing emergency.'" *Id*. at 1156 (quoting *Davis*, 547 U.S. at 822).  The Court explained that to determine the "primary purpose" of the encounter, a court must "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties."  *Id*.  After providing further guidance about how courts should go about this task, *see id*. at 1156-62, the Court determined that the statements in that case were not testimonial.

The Court found significant several factors, including that: (1) no one at the time knew whether the victim was shot as part of a private dispute or that the threat to the officers or the public posed by the assailant had ended, *see id*. at 1163-64; (2) unlike in the domestic violence cases involved in *Davis*, physical separation had not necessarily ended the threat because the assailant had used a gun, *see id*. at 1164; (3) the emergency was ongoing, because neither the victim nor the police knew the location of the shooter, and thus there was "an armed shooter, whose motive for and location after the shooting [was] unknown," *id*. at 1165; (4) the condition of the victim, who was in considerable pain and on the brink of death, suggested that the victim would not "have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution,'" *id*. (quoting *Davis*, 547 U.S. at 822); (5) the question the police asked–what happened, who had shot the victim, and where the shooting had occurred–"were the exact type of questions necessary to allow the police to assess the situation, the threat to their own safety, and possible danger to the potential victim and to the public," *id*. at 1166 (internal quotation omitted); and (6) the encounter occurred in an informal setting and therefore differed from the structured, station-house interview involved in *Crawford*, *see id*.  All of these factors point to the conclusion that the Michigan Court of Appeals reasonably applied *Crawford* in determining that the victim's

18

statements were not testimonial.  As in *Bryant*, here the police responded to a call indicating a man had been shot, at the time of the encounter neither the victim nor the police knew the whereabouts of the assailant, a gun had been used, the victim was in pain and on the brink of death, and the police questioning occurred in an informal setting and was necessary to meet the ongoing emergency of an armed gunman roaming the streets.

However, the Court need not rely on this determination in rejecting petitioner's habeas claim, because regardless of whether the victim's statements were testimonial the Michigan Court of Appeals's conclusion that they were nonetheless admissible as dying declarations was a reasonable application of *Crawford*.  In *Crawford*, the Supreme Court noted, but did not definitively determine, that the dying declaration exception may provide an historical exception to the Confrontation Clause's bar on testimonial hearsay.  After explaining that none of the Court's prior cases involving other hearsay exceptions resulted in admission of testimonial hearsay, the Court observed:

> The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*.

*Crawford*, 541 U.S. at 56 n.6 (citations omitted).  Relying on this language, and on the California Supreme Court's decision in *People v. Monterroso*, 101 P.3d 956 (2004), the court of appeals in petitioner's case concluded that dying declarations are admissible notwithstanding their testimonial nature.  The court explained that in *Crawford* the Supreme Court held that "'the confrontation clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding,"'" *Taylor*, 275 Mich. App. at 183, 737 N.W.2d at 795 (quoting *Monterroso*, 101 P.3d at 972) (quoting *Crawford*, 541 U.S. at 54)), and

19

noted that at common law it was well established that dying declarations were admissible, *see id*. at 182-83, 737 N.W.2d at 794-95 (quoting *Monterroso*, 101 P.3d at 972).  This determination was reasonable.

As noted above, in *Crawford* the Court noted the possible existence of a dying declaration exception to the Confrontation Clause, but did not definitively rule on the question.  *See Crawford*, 541 U.S. at 56 n.6.  And as recently as this year, in *Bryant*, the Court again declined to resolve whether testimonial dying declarations are admissible as an exception to the Confrontation Clause.  *See Bryant*, 131 S. Ct. at 1151 n.1.  As the Supreme Court has explained on several occasions, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009) (internal quotation omitted); *accord Wright v. Van Patten*, 552 U.S. 120, 126 (2008).  To be sure, two federal district courts have concluded that testimonial dying declarations are inadmissible under the logic of *Crawford*.  *See United States v. Mayhew*, 380 F. Supp. 2d 961, 965-66 (S.D. Ohio 2005); *United States v. Jordan*, No. 04-CR-229-B, 2005 WL 513501, *3 (D. Colo. March 3, 2005).  The majority of the courts to have considered the question, however, have relied on the *Crawford* dictum to conclude that testimonial dying declarations remain admissible under the Confrontation Clause.  *See Duncan v. Bobby*, No. 1:07 CV 839, 2008 WL 111229, *8 (N.D. Ohio Jan.8, 2008); *Williams v. State*, 947 So. 2d 517, 520 (Fla. Ct. App. 2006) (citing cases); *Monterroso*, 101 P.3d at 972.  *See generally, Miller v. Stovall*, 573 F. Supp. 2d 964, 995-96 (E.D. Mich. 2008) (Roberts, J., adopting in relevant part Report of Komives, M.J.), *aff'd*, 608 F.3d 913 (6th Cir. 2010), *pet. for cert. filed*, 79 U.S.L.W. 3404 (Dec. 21, 2010).

Further, although the Supreme Court declined to definitively rule on this question in

*Crawford*, it has long recognized that dying declarations are a well-established exception to the general rule prohibiting unconfronted testimony at trial.  *See Mattox v. United States*, 156 U.S. 237, 243-44 (1895).  And in *Giles v. California*, 554 U.S. 353 (2008), the Court strongly suggested that the dying declaration exception permits the introduction of testimonial dying declarations.  In that case, the Court considered whether the common law exception allowing introduction of testimonial statements from a witness whose absence the defendant wrongfully procured (the so-called forfeiture by wrongdoing exception) survived *Crawford*.  In determining that the exception did survive, the Court  explained that the "Confrontation Clause is 'most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.'" *Id*. at 358 (quoting *Crawford*, 541 U.S. at 54).  It further explained that in *Crawford* it had "acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted," the second of which were covered by the forfeiture by wrongdoing exception at issue in *Giles* but the first of which consisted of "declarations made by a speaker who was both on the brink of death and aware that he was dying." *Id*.  Because the Court upheld the admissibility of statements covered by the forfeiture by wrongdoing exception, and because the court placed that exception on a par with the historical exception for dying declarations, *Giles* strongly suggests that the Court would recognize the continued viability of the dying declaration exception to the Confrontation Clause.

In light of the Supreme Court's explicit refusal to decide the question in *Crawford* and *Bryant*, the recognition of the historical basis of the dying declaration exception in *Giles* and *Mattox*, and the majority of decisions recognizing the continued viability of the dying declaration exception under *Crawford*, the Michigan Court of Appeals's determination that testimonial dying declarations

remain admissible under the Confrontation Clause was not an unreasonable application of clearly

established federal law.  See *Martin v. Fanies*, 365 Fed. Appx. 736 (8th Cir. 2010); *Nesbitt v. St.

Amand*, No. No. 09–10615, 2011 WL 1232376, at *13 (D. Mass. Mar. 30, 2011) (citing cases);

*Gilmore v. Lafler*, No. 2:07–cv–14010, 2010 WL 2560034, at *11 (E.D. Mich. June 15, 2010)

(Borman, J.); *Jones v. Davis*, No. 05CV 70897, 2006 WL 1452505, at *6 n.3 (E.D. Mich. May 23,

2006) (Rosen, J.).

In a final attempt to support his claim, petitioner contends that even if the common law rule

permitting introduction of dying declarations survives *Crawford*, the victim's statements in his case

did not meet that common law exception; rather, they met only the broader exception set forth in the

Michigan Rules of Evidence.  At the outset, petitioner cannot show that the state courts' reliance on

the Michigan Rule of Evidence standard was unreasonable, as the federal courts' handling of *Giles*

makes clear.  Following *Crawford* a number of courts, including the Michigan Court of Appeals,

took an expansive view of the forfeiture by wrongdoing exception, holding that the exception is

applicable whenever the defendant procured the witness's absence regardless of motive. Thus, in

a murder case the victim's prior statements could be admitted, regardless of whether the defendant

killed the victim for the purpose of preventing her from testifying.  *See, e.g.*, *United States v.

Garcia-Meza*, 403 F.3d 364, 370 (6th Cir. 2005); *People v. Bauder*, 269 Mich. App. 174, 183-87,

712 N.W.2d 506, 513-15 (2005). In *Giles*, the Supreme Court rejected this expansive view of the

forfeiture by wrongdoing exception. Rather, the Court explained, "[t]he terms used to define the

scope of the forfeiture rule [at common law] suggest that the exception applied only when the

defendant engaged in conduct *designed* to prevent the witness from testifying."  *Giles*, 554 U.S. at

359. The court noted "[c]ases and treatises of the time indicate that a purpose-based definition of

22

[the] terms [used to describe the doctrine] governed," and that the cases applying the rule at common law made "plain that unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying." *Id.* at 360-61.

Under *Giles*, petitioner is correct that courts are limited in applying the dying declaration exception to the common law understanding of that exception at the time the Confrontation Clause was adopted. *Giles*, however, was decided over a year after the Michigan Court of Appeals's decision in petitioner's case, and thus was not clearly established federal law at that time. And the federal courts have repeatedly rejected habeas claims premised on a state court's admission of evidence under the broad forfeiture by wrongdoing exception rejected in *Giles* where *Giles* had not been decided at the time of the relevant state court decision. *See Ponce v. Felker*, 606 F.3d 596, 604-06 (9th Cir. 2010); *Clark v. Romanowski*, No. 08-10523, 2010 WL 3430782, at *7 (E.D. Mich. Aug. 30, 2010) (Roberts, J.); *Meeks v. McKune*, 607 F. Supp. 2d 1235, 1243-44 (D. Kan. 2009), *certificate of appealability denied*, 354 Fed. Appx. 348, 352 (10th Cir. 2009). Because the Supreme Court has not delineated the contours of the dying declaration exception to the Confrontation Clause under *Crawford*, and because the *Giles* Court's guidance in focusing on the narrow common law forfeiture by wrongdoing exception was not clearly established law at the time of the court of appeals's decision, it cannot be said that the court's reliance on the Michigan codification of the dying declaration exception was an unreasonable application of clearly established federal law.

In any event, petitioner has failed to show that the victim's statements were inadmissible under the common law understanding of the dying declaration exception. As adopted in Michigan, the dying declaration exception permits the introduction, "[i]n a prosecution for homicide or in a civil action or proceeding, [of] a statement made by a declarant while believing that the declarant's

23

death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." MICH. R. EVID. 804(b)(2). This standard essentially mirrors the common law definition. The Michigan rule is identical to the federal rule established in FED. R. EVID. 804(b)(2), which in itself is a codification of the common law rule with only the expansion (irrelevant here) of the rule to apply in civil cases. *See* FED. R. EVID. 804(b)(2), advisory committee notes to 1972 proposal and 1974 enactment. *See generally*, 5 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW §§ 1431-34 (James H. Chadbourn rev. ed. 1974)  Petitioner does not contend that the Michigan rule's requirements that the statement be made under belief of impending death and that the statement be concerning the cause or circumstances of that impending death deviate from the common law requirements; nor does he argue that those requirements were not satisfied in his case. Rather, relying on *Carver v. United States*, 164 U.S. 694 (1897), and *Shepard v. United States*, 290 U.S. 96 (1933), petitioner argues that the victim's statements were not admissible because it reflected facts about which he was not competent to testify. In *Carver*, the Court noted that even though dying declarations are admissible notwithstanding the hearsay rule, they may nevertheless "be inadmissible by reason of . . . any other fact which would make [the declarant] incompetent as an ordinary witness." *Carver*, 164 U.S. at 697. Similarly, in *Shepard* the Court explained that "[t]he declaration is kept out if the setting of the occasion satisfies the judge, or in reason ought to satisfy him, that the speaker is giving expression to suspicion or conjecture, and not to known facts." *Shepard*, 290 U.S. at 101.

Relying on *Carver* and *Shepard*, petitioner argues that the victim's statements were not admissible because

> Lasater was apparently asleeping [sic] in bed when someone placed a chair on the front lawn before sunrise, stood on the chair, and fired four shotgun blasts through

24

the bedroom window. The prosecution, the proponent of Lasater's statements, did not introduce a shred of evidence that Lasater was awake or that he possibly could have seen who was firing the shots through the window in the night.

Pet'r's Reply, at 9. Contrary to petitioner's argument, however, definitive proof the victim's competence is not required before testimony is admitted as a dying declaration. As the Court explained in *Shepard*, "[o]ne does not hold the dying to the observance of all the niceties of speech to which conformity is exacted from a witness on the stand. What is decisive is something deeper and more fundamental than any difference of form." *Shepard*, 290 U.S. at 101. Thus, "[t]o let the declaration in, the *inference* must be *permissible* that there was knowledge *or the opportunity for knowledge* as to the acts that are declared." *Id.* (emphasis added). As the highlighted portions of this statement make clear, "proof of the victim's actual observation of the facts declared is not required; instead, what needs to been shown is that the victim had the opportunity to observe the facts that he declares." *Commonwealth v. Griffin*, 684 A.2d 589, (Pa. Super. Ct.1996). As one state court long ago observed:

> Where it was manifestly impossible that the deceased could have seen his assailant or known certainly who he was, a mere expression of opinion as to who he was is not admissible as a dying declaration; but where want of knowledge does not appear either from the statement itself or from other evidence in the case, it must be presumed that the declarant stated a fact within his knowledge. In these circumstances it was a question for the jury whether the declaration represented the primary knowledge of the deceased or merely his opinion.

*Strickland v. State*, 145 S.E. 879, 881 (Ga. 1928); *see also*, 2 MCCORMICK ON EVIDENCE, § 313 at 370 (6th ed. 2006); 5 WIGMORE, *supra*, § 1445(2) ("The declarant must have had actual observation or opportunity for observation of the fact which he relates.").

Here, the circumstances give rise to a reasonable inference that the victim had the opportunity to observe petitioner shooting at him. Petitioner did not shoot at the house from afar;

rather, he stood on a chair and fired directly into the window.  This would have provided the victim, who well knew petitioner, the opportunity to observe him.  Further, although petitioner infers that Lasater was sleeping, it is an equally plausible inference that the victim was awake when the shooting started, or at a minimum awoke during the shooting in sufficient time to observe petitioner. Further, although the victim initially hesitated in identifying his attacker, once he did so he did not equivocate or suggest anything other than actual knowledge of his shooter.  *See United States v. West*, No. 06-20185, 2009 WL 2026320, at *4 (E.D. Mich. July 8, 2009) (Roberts, J.) *State v. Pailin*, 576 A.2d 1384, 1386-87 (R.I. 1990).  In short, "[t]he evidence does not show that it was impossible for the deceased to have seen the person who shot him, and it was a question of fact for the jury to determine whether the deceased had personal knowledge of his assailant's identity."  *Hawkins v. State*, 101 S.E.2d 710, 712 (Ga. 1958).[3]

In short, the Michigan Court of Appeals reasonably applied *Crawford* in finding that the statements by the victim were not testimonial hearsay barred by the Confrontation Clause. Alternatively, the court of appeals reasonably applied *Crawford* in determining that there remains

---

[3]The cases cited by petitioner in his reply brief, *see* Pet'r's Reply, at 8-9, are all inapposite because they all involved circumstances in which it was clear that the victim had no personal knowledge or it was physically impossible for the victim to have observed his or her assailant.  *See Jones v. State*, 12 S.W. 704, 704 (Ark. 1889) (per curiam) ("it was physically impossible for Keltner to have seen who shot him."); *People v. Wasson*, 4 P. 555, 556 (Cal. 1884) (victim's statement as to who he thought shot him inadmissible where "[h]e did not see the defendant fire the shot, and did not pretend to know who it was that shot him."); *Green v. Commonwealth*, 18 S.W. 515, 516 (Ky. 1892) (shooter was behind a thicket, and victim had previously made numerous statements denying knowledge of who shot him); *Binn v. State*, 46 Ind. 311, 1874 WL 5719, at *2 (1874) (victim's declaration made clear that it was not based on actual knowledge); *Jones v. State*, 30 So. 759, 760 (Miss. 1901) (victim was shot through a window over which a shade was mostly drawn and toward which her back was turned, while she was on the far side of a crowded room); *State v. Wilks*, 213 S.W. 118, 120 (Mo. 1919) (victim shot at night through window covered by screen and curtain in lighted room, and it was "apparent that he could not see through these obstructions"); *State v. Williams*, 67 N.C. 12, 1872 WL 2319, at *2 (1872) (victim identified killer but explicitly stated that "I did not see him."); *State v. Burnett*, 35 S.E. 983, 985-86 (W. Va. 1900) (victim identified person whom he thought shot him, but stated he did not know and did not see who shot him).

a dying declaration exception to the Confrontation Clause and that the victim's statements came within that exception. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his confrontation claim.

E.      *Sufficiency of the Evidence (Claim II)*

Petitioner next contends that the evidence presented at trial was insufficient to prove his guilt beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997),

27

*vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment. Specifically, under Michigan law, first degree murder includes any "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing," MICH. COMP. LAWS § 750.316(1)(a), as well as "[m]urder committed in the perpetration of, or attempt to

28

perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping." MICH. COMP. LAWS § 750.316(1)(b).  Under either theory of first degree murder, the prosecution must show that a defendant had the mental state necessary for murder, that is, malice aforethought.  *See generally*, *People v. Aaron*, 409 Mich. 672, 713-21, 299 N.W.2d 304, 319-323 (1980); *People v. Turner*, 213 Mich. App. 558, 556, 540 N.W.2d 728, 732-33 (1995) (per curiam).  Under Michigan law, malice is established by showing that the defendant possessed one of three mental states:  (1) intent to kill; (2) intent to do serious bodily harm; or (3) wanton and willful disregard for the likelihood that the natural tendency of his act is to cause death or great bodily harm.  *See Aaron*, 409 Mich. at 733, 299 N.W.2d at 328.  Thus, with respect to first-degree premeditated murder, "the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate."  *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995); *see also*, *Grant v. Rivers*, 920 F. Supp. 769, 786 (E.D. Mich. 1996); *People v. Younger*, 380 Mich. 678, 681, 158 N.W.2d 493, 495 (1968); *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597 (1984).

2.    *Analysis*

Here, petitioner contends that the evidence was insufficient to establish both his identity as the shooter and that he premeditated the killing.  With respect to identity, the Michigan Court of Appeals determined that the evidence, viewed in the light most favorable to the prosecution, was sufficient to establish petitioner's identity.  Specifically, the court noted that the victim identified him as the shooter in the dying declaration; the victim and petitioner had been in an altercation at

29

a party the night before; a neighbor heard a voice shortly before the shooting that she recognized as the voice of someone at the party the night before; and a half-empty box of shotgun shells with petitioner's fingerprints was found on a couch at petitioner's residence, and the bunting mark on the shells was the same as the bunting mark on the shells used in the shooting. *See Taylor*, 275 Mich. App. at 179-80, 737 N.W.2d at 793. The court of appeals concluded that this evidence "was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that defendant shot and killed Lasater[.]" *Id*. at 180, 737 N.W.2d at 793. This determination was reasonable. As the court of appeals explained, the victim's dying declaration identifying petitioner as the shooter was buttressed by circumstantial evidence, most notably evidence of petitioner's motive (*i.e.*, his previous altercation with the victim) and a half-used box of shotgun shells of the same type, and with the same bunting markings, as the shells used in the shooting. From this evidence, a rational juror could have concluded beyond a reasonable doubt that petitioner was the shooter.

The Michigan Court of Appeals also rejected petitioner's claim that the evidence was insufficient to establish premeditation and deliberation. The court reasoned that "the evidence that defendant and Lasater fought the night before the shooting allowed the jury to infer that defendant had a preconceived motive to shoot Lasater." *Taylor*, 275 Mich. App. at 180, 737 N.W.2d at 793. Further, the evidence supported an inference that petitioner left the victim's home, obtained a shotgun, placed a lawn chair under the window, and then deliberately fired into the victim's room. *See id*. This evidence "was sufficient to enable the jury to conclude beyond a reasonable doubt that defendant shot Lasater after premeditating and deliberating about the crime." *Id*. This determination was reasonable.

Premeditation occurs where there was sufficient time between the homicidal intent and the

30

action to afford a reasonable person time to take a second look. *See People v. Gonzalez*, 468 Mich. 636, 641, 664 N.W.2d 159, 163(2003); *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597. Further, it is well established that both intent to kill and "premeditation and deliberation may be inferred from the circumstances surrounding the killing." *People v. Ortiz-Kehoe*, 237 Mich. App. 508, 520, 603 N.W.2d 809 (1999); *accord Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998); *People v. McRunels*, 237 Mich. App. 168, 181, 603 N.W.2d 95, 102 (1999); *Anderson*, 209 Mich. App. at 537, 531 N.W.2d at 786. Relevant factors include the relationship of the parties, the defendant's actions prior to the killing, the circumstances of the killing, and the defendant's conduct after the killing. *See id.*; *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597. Here, taken in the light most favorable to the prosecution the evidence showed that petitioner armed himself with a shotgun after a confrontation with victim, returned to the victim's home, and fired multiple shots directly into the window of the victim's bedroom. This evidence was sufficient to support a finding that petitioner both intended and premeditated the killings. *See People v. Coates*, No. 200658, 1998 WL 1992478, at *2 (Mich. Ct. App. Mar. 24, 1998) (per curiam); *People v. Turner*, No. 186053, 1997 WL 33351193, at *2 (Mich. Ct. App. Apr. 11, 1997) (per curiam); *see also*, *Government of the Virgin Islands v. Jacobs*, 438 F.2d 329, 331 (3d Cir. 1971) (per curiam); *Johnigan v. Elo*, 207 F. Supp. 2d 599, 608 (E.D. Mich. 2002) (Steeh, J.); *People v. Ritsema*, 105 Mich. App. 602, 609, 307 N.W.2d 380, 383 (1981); *People v. Johnson*, 54 Mich. App. 303, 304, 220 N.W.2d 705, 706 (1974). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[4]

---

[4]To the extent petitioner contends that the evidence was insufficient because the victim's dying declaration was erroneously admitted and, without that declaration the evidence is otherwise insufficient, he is not entitled to habeas relief. While the erroneous admission of evidence may, or may not, entitle a habeas petitioner or appellant to relief on that basis, in assessing the sufficiency of the evidence the Court is required to weigh all of the evidence, even that evidence which was improperly admitted. *See United States v. Carneglia*, 47 Fed. Appx. 27, 34-35 (2d Cir. 2002); *United States v. Castaneda*, 16 F.3d 1504,

F.     *Prosecutorial Misconduct (Claim III)*

Petitioner next contends that he was denied a fair trial by the prosecutor's misconduct at trial. The Court should conclude that petitioner is not entitled to habeas relief on this claim.[5]

1.     *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted).

---

1510 (9th Cir. 1994); *cf. Lockhart v. Nelson*, 488 U.S. 33, 38-39 (1988) (in assessing whether the evidence was sufficient for purposes of determining whether retrial is permitted under the Double Jeopardy Clause, court looks at all of the evidence admitted, even that which was improperly admitted).

[5]In rejecting petitioner's claim, the Michigan Court of Appeals conducted a limited review based on petitioner's failure to object to the alleged misconduct at trial. *See People v. Taylor*, 275 Mich. App. at 185, 737 N.W.2d at 795-96. Because petitioner did not raise his prosecutorial misconduct claim here until his amended petition, to which respondent has not had an opportunity to respond, respondent has obviously not made an argument that the claims are barred by the procedural default doctrine, and accordingly, I do not address that doctrine. In light of the circumstances in which petitioner's prosecutorial misconduct claim has been raised, however, if the Court rejects my conclusion regarding the merits of the claim respondent should not be deemed to have waived the procedural default argument and should be permitted to file a supplemental answer addressing that issue.

32

In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

    2.    *Analysis*

Petitioner first contends that the police and prosecutor committed misconduct by eliciting and then introducing at trial the victim's dying declaration knowing that he would be unable to confront the victim about his statement.  As explained above, however, the victim's dying declaration was properly admitted at trial.  A prosecutor does not commit misconduct by introducing admissible evidence or commenting on evidence admitted in the course of the trial during argument. *See Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997); *Hammond v. Michigan Parole Bd.*, No. 04-73385, 2006 WL 2161028, at *16 (E.D. Mich. July 31, 2006) (Roberts, J., adopting Recommendation of Komives, M.J.).

Petitioner next contends that the prosecutor committed misconduct by stating, during opening argument, that a neighbor would testify that she heard someone knock on the victim's door about 30 minutes before the shooting and identify himself as "Boog."  Trial Tr., dated 7/27/05, at 124-25.  During the witness's testimony, however, the trial court upheld petitioner's objection to this evidence, concluding that the evidence was inadmissible because the witness could not establish that the voice she heard belonged to petitioner.  *See id.*, dated 8/2/05, at 37-48.  The prosecutor was subsequently permitted to recall the witness to testify that the voice she heard at the door was the same as a voice she heard at the party, without expressly identifying to whom the voice belonged. *See id.*, dated 8/4/05, at 4-9.  Thus, at the time of the prosecutor's opening statement, he did not know that the neighbor's testimony would be ruled inadmissible, and had a good faith belief that the evidence was admissible as non-hearsay as an admission of petitioner, a party opponent. *See* MICH.

R. EVID. 801(d).  A prosecutor does not commit misconduct by referring during opening statement to evidence the prosecutor intends to introduce and which in good faith he believes is admissible. *See United States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir. 1997).  Further, even assuming that the opening statement was improper, petitioner cannot show that he was denied a fair trial, because the court instructed the jury that the prosecutor's opening statement was not evidence.  *See* Trial Tr., dated 7/27/05, at 104-06.  In *Frazier v. Cupp*, 394 U.S. 731 (1969), the petitioner argued that the prosecutor's reference to a coconspirator's confession during opening statement deprived him of his right to confront the witnesses against him when the coconspirator invoked his right to remain silent and did not testify.  The Supreme Court found that the trial court's instruction that the prosecutor's opening statement was not evidence cured any possible prejudice:

> It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable. But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce.  Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance.  Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given.  Even if it is unreasonable to assume that a jury can disregard a coconspirator's statement when introduced against one of two joint codefendants, it does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial.

*Id*. at 736.  Here, as in *Frazier*, the prosecutor gave an objective summary of the evidence he expected to produced and the trial court instructed the jury that the statements and arguments of the prosecutor were not evidence.  This case is thus nearly identical to *Frazier*, and petitioner cannot show that he was denied a fair trial by the prosecutor's opening statement comment.

Finally, petitioner contends that the prosecutor committed misconduct by eliciting from Detective Ralston evidence regarding the shotgun owned by petitioner's mother, which was

34

determined not to have been the gun involved in the shooting. As the Michigan Court of Appeals explained, however, this testimony "was relevant to establish the prosecutor's theory that defendant's mother had two shotguns, one of which was never recovered." *Taylor*, 275 Mich. App. at 186, 737 N.W.2d at 796. Thus, "the prosecutor had a legitimate basis for believing that the evidence was admissible," *id.*, and the elicitation of this evidence therefore did not constitute misconduct. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.     *Fair Cross-Section (Claim IV)*

Finally, petitioner contends that he was denied his Sixth Amendment right to a jury drawn from a fair cross-section of the community. The Court should conclude that petitioner is not entitled to habeas relief on this claim.[6]

1.     *Clearly Established Law*

The Sixth Amendment guarantees a criminal defendant the right to be tried before a jury drawn from a fair cross-section of the community. *See Duren v. Missouri*, 439 U.S. 357, 359 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 526-31 (1975).

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

---

[6]As with petitioner's prosecutorial misconduct claim, there is a good chance that this claim is barred by petitioner's procedural default in the state courts. *See Taylor*, 275 Mich. App. at 184, 737 N.W.2d at 795 (noting that the claim is reviewed only for plain error because petitioner failed to object to the jury composition at trial). Thus, as with the prosecutorial misconduct claim, if the Court rejects my conclusion regarding the merits of the claim, the Court should permit respondent an opportunity to advance this argument.

*Duren*, 439 U.S. at 364.

    2.    *Analysis*

The Michigan Court of Appeals rejected petitioner's claim, concluding that he had failed to show any evidence of systematic exclusion of African Americans from the jury pool. The court explained that although "[d]efendant asserts that the systematic underrepresentation of African-Americans was 'plainly evident' in his case, . . . there is nothing in the record to indicate the racial makeup of defendant's venire, or more importantly, that any underrepresentation was because of systematic exclusion." *Taylor*, 275 Mich. App. at 184, 737 N.W.2d at 795 (footnote omitted). The court also observed that "[d]efendant asserts that his jury was entirely white, but does not indicate how many African-Americans were in the jury pool, saying only that there were 'virtually no potential black jurors.'" *Id.* at 184 n.1, 737 N.W.2d at 795 n.1. Because petitioner failed to meet his burden of showing underrepresentation or systematic exclusion, the court rejected his claim. *See id.* at 184, 737 N.W.2d at 795. The Court should conclude that this determination was reasonable.

*Duren* makes clear that petitioner bears the burden of establishing each element of the *prima facie* fair-cross section claim, including underrepresentation and systematic exclusion. *See Berghuis v. Smith*, 130 S. Ct. 1382, 1395 (2010); *Duren*, 439 U.S. at 364. In his brief to the Michigan Court of Appeals, petitioner pointed to no facts suggesting systematic exclusion. With respect to underrepresentation, he presented only his assertion that his jury was all white, with no discussion of the racial composition of the jury venire from which his jury was selected. Thus, petitioner's only evidence of systematic exclusion is the bare fact that his jury included no African Americans. However, it is well established that "[e]vidence of a discrepancy on a single venire panel cannot demonstrate systematic exclusion." *United States v. Horne*, 4 F.3d 579, 588 (8th Cir. 1993); *accord*

*United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001); *United States v. Hill*, 197 F.3d 436, 445 (10th Cir. 1999); *United States v. DeFries*, 129 F.3d 1293, 1301 (D.C. Cir. 1997). Petitioner has presented no evidence that other venires did not include a fair representation of African Americans, or that the method used to draw the jury pool was designed to exclude African Americans. *See Williams*, 264 F.3d at 568; *United States v. Green*, 742 F.2d 609, 611 (11th Cir. 1984); *Concepcion v. United States*, 181 F. Supp. 2d 206, 227 (E.D.N.Y. 2002). Accordingly, the Michigan Court of Appeals's rejection of his claim was a reasonable application of *Duren*, and the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.     *Recommendation Regarding Certificate of Appealability*

     1.     *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial

37

showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.""" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2. *Analysis*

Here, if the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should nevertheless grant a certificate of appealability with respect to petitioner's

confrontation claim.  As explained in connection with that claim, it is a close question whether the victim's dying declaration constituted testimonial hearsay, and there remains an open question with respect to whether, and to what extent, testimonial dying declarations are barred by the Confrontation Clause.  In light of these uncertainties, it cannot be said that the resolution of petitioner's confrontation claim is beyond reasonable debate.  Accordingly, the Court should grant petitioner a certificate of appealability with respect to that claim.

However, in all other respects that Court should deny petitioner a certificate of appealability, for the reasons explained above.  With respect to petitioner's sufficiency of the evidence claim, there was more than sufficient evidence to establish petitioner's identity as the shooter and prove his premeditation beyond a reasonable doubt.  Thus, the resolution of this claim is not reasonably debatable.  With respect to petitioner's prosecutorial misconduct claims, it is clear that petitioner's claims all relate to evidence which either was admissible, or with respect to which the prosecutor had a good faith belief was admissible.  Thus, the resolution of petitioner's prosecutorial misconduct claim is not reasonably debatable.  Finally, because petitioner failed to provide any evidence of underrepresentation or systematic exclusion regarding the jury pool, the resolution of petitioner's fair cross-section claim is not reasonably debatable.  Accordingly, the Court should deny petitioner a certificate of appealability with respect to these claims.

I.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the

Court should grant petitioner a certificate of appealability with respect to his confrontation claim, and should deny a certificate of appealability with respect to petitioner's remaining claims.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated: 6/14/11

40

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on June 14,  2011.

s/Eddrey Butts
Case Manager